ROYAL INSURANCE COMPANY OF
AMERICA as Subrogee of Patrick
and Linda Magee, Plaintiff,

v.

JOSEPH DANIEL CONSTRUCTION,
INC., Defendant.

No. CIV.A. 00 CIV. 8706CM (GAY).

United States District Court,
S.D. New York.

July 10, 2002.

## DECISION DENYING DEFENSE MOTION TO PRECLUDE AND FOR SUMMARY JUDGMENT

McMAHON, District Judge.

This action involves an attempt by Royal Insurance Company of America ("Royal") to recover in subrogation for the sum of $564,000 paid by Royal for fire damage to the property of its subrogors, Patrick and Linda Magee. Defendant filed a motion pursuant to Federal Rules of Evidence 104(a) and 702, to preclude the trial testimony of the plaintiff's fire origin and cause consultant, Patrick J. McGinley ("McGinley"). Defendant also filed a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 on the ground that, after McGinley's testimony is precluded, there is no evidence to support plaintiff's position.

Both motions are denied.

### I. Facts pertinent to the motion

Prior to the fire, the defendant, Joseph Daniel Construction ("JDC"), was hired by plaintiff to provide construction work on a garage located on Magee's property. JDC's employees, working at the garage on Monday, December 14, 1998, used an acetylene torch to install new beams above the second floor of the garage. During the course of work that day, separate fires were ignited in a bag of sawdust and in a car seat in the garage. Both fires were extinguished. At the end of the workday, JDC employees removed the equipment

and the fire protection blankets that had been placed across a substantial portion of the floor. The workers testified that there was no evidence of a fire when they left the garage that evening.

Both Patrick Magee, Sr. and Patrick Magee, Jr. were on the first floor of the garage on the evening of Monday, December 14, 1998, after the JDC employees departed. Patrick Magee, Sr. was the last known individual to leave the garage before the fire, and he reported that there was no indication of a fire when he left.

On or about 6:00 A.M. on Tuesday, December 15, 1998, the Stony Point Fire Department responded to the report of a fire in the Magee garage. Approximately fourteen hours had passed between the time the JDC employees left the Magee property and the time the fire was discovered.

Approximately one year later, Patrick J. McGinley Associates, Inc. was retained by subrogation counsel to investigate the cause of the fire. Patrick J. McGinely, in addition to serving as president of Patrick J. McGinely Associates, Inc. (Fire and Code Consultants), had worked for the City of Philadelphia Fire Department from 1964 to 1984. At different times during his tenure in Philadelphia, he served as a fire marshall, deputy chief, battalion chief, captain, lieutenant and fire fighter.

After investigating the origin and cause of the fire, McGinely concluded that the "fire was caused by the careless use of welding/cutting equipment on the part of Joseph Daniel Construction employees." He also concluded that the manner in which the JDC employees cut the beam at

in the Magee's garage violated Chapters 241 and 51B of the National Fire Protection Association codes.

## II. Discussion

### A. Preclusion of Expert Testimony

#### (1) Standard

The district court serves as the "gatekeeper" with respect to decisions regarding the admissibility of expert testimony. *Daubert v. Merrell Dow Pharmals, Inc.,* 509 U.S. 579, 597, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993); *see Travelers Prop. & Cas. Corp. v. Gen. Elec. Co.,* 150 F.Supp.2d 360, 362 (D.Conn.2001); *see* Advisory Committee Notes, 2000 Amendments, Fed. R.Evid. 702 (trial judges have "the responsibility of acting as gatekeepers to exclude unreliable expert testimony").

Under the standards set forth in *Daubert* and Federal Rules of Evididence 702 [1], the admissibility of expert testimony "entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert,* 509 U.S. at 592–93, 113 S.Ct. 2786; *see also Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 141, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999) (holding that "*Daubert*'s general holding ... applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge").

This assessment depends upon a two-part inquiry, examining the relevance and the reliability of the testimony sought to be introduced. *Daubert,* 509 U.S. at 597, 113 S.Ct. 2786; *see also Kumho Tire,* 526

---

**1.** Rule 702 provides that: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Fed.R.Evid. 702.

U.S. at 141, 119 S.Ct. 1167. In the first part of the test, a district court must determine whether a reliable methodology was used by the expert witness in reaching his conclusion. *Daubert,* 509 U.S. at 595, 113 S.Ct. 2786 ("The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate."). Although *Daubert* provides factors that may be considered by the court in its evaluation of the expert witness's methodology, the list of factors is not exhaustive, and the court, in its discretion, may consider different factors to test reliability. *Daubert,* 509 U.S. at 594, 113 S.Ct. 2786 ("The inquiry envisioned by Rule 702 is ... a flexible one."); *see Kumho Tire,* 526 U.S. at 141–42, 119 S.Ct. 1167 (citing *Daubert,* 509 U.S. 579, 113 S.Ct. 2786); *see also, Travelers,* 150 F.Supp.2d at 364 ("No single factor is necessarily dispositive of the reliability of a particular expert's testimony and '[a] review of the case law after *Daubert* shows that the rejection of expert testimony is the exception rather than the rule.'") (quoting Advisory Committee Notes, 2000 Amendments, Fed.R.Evid. 702). These factors may include: (1) whether the theory or technique in question can be (and has been) tested; (2) whether it has been subjected to peer review and publication; (3) the known or potential error rate of the theory or technique; (4) the existence and maintenance of standards controlling its operation; and (5) whether the theory has attracted widespread acceptance within a relevant scientific community. *Daubert,* 509 U.S. at 593–94, 113 S.Ct. 2786. The Court may also consider the expert's background and professional experience. *See Travelers,* 150 F.Supp.2d 360 (finding that the expert's "experience; knowledge and train-

ing, taken together with the process he described ... analyzing the burn patterns in each dryer and then ruling out potential alternative explanations, is sufficient to meet the *Daubert* threshold of admissibility").

Having determined that the testimony of an expert is based on a reliable methodology, in the second part of the *Daubert* test, a district court must then evaluate the relevancy of the testimony by determining whether the information presented "will assist the trier of fact to understand the evidence or to determine a fact in issue." Fed.R.Evid. 702.

■ Rule 104(a) governs the admissibility of all expert testimony.[2] *See* Advisory Committee Notes, 2000 Amendments, Fed.R.Evid. 702 ("In deciding whether the opinion evidence is reasonably reliable and will substantially assist the trier of fact, as well as in deciding whether the proposed witness has sufficient expertise to express such opinions, the court, as under present Rule 702, is governed by *Rule 104(a)*"). Furthermore, the party offering the expert testimony has the burden of establishing admissibility by a preponderance of the evidence. *Bourjaily v. United States,* 483 U.S. 171, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987); *see also Daubert,* 509 U.S. at 592 n. 10, 113 S.Ct. 2786.

While "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert," *Gen. Elec. Co. v. Joiner,* 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997), the court must also take care not "to exclude an expert's testimony on the ground that the court believes one version of the facts and not

2. Rule 104(a), entitled "Questions of admissibility generally", provides that: "Preliminary questions concerning the qualification of a person to be a witness, the existence of a privilege, or the admissibility of evidence shall be determined by the court, subject to the provisions of subdivision (b). In making its determination it is not bound by the rules of evidence except those with respect to privileges." Fed.R.Evid. 104(a).

the other." Advisory Committee Notes, 2000 Amendments, Fed.R.Evid. 702. The district court is not charged with weighing the correctness of an expert's testimony, nor must the court choose between the testimony of competing expert witnesses. *Travelers*, 150 F.Supp.2d at 364 (citing *Kumho Tire*, 526 U.S. at 152, 119 S.Ct. 1167). Rather, "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596, 113 S.Ct. 2786.

■ Once the thresholds of reliability and relevance are met, the testimony is admissible. Thereafter, any purported weakness in an expert's methodology or conclusion goes to the degree of credibility to be accorded to the evidence, not to the question of its admissibility. *Ambrosini v. Labarraque*, 101 F.3d 129, 133–35 (D.C.Cir.1996) (holding that "the fact that several possible causes might remain 'uneliminated' " goes to the weight rather than the admissibility of the expert's testimony) (citing *Mendes–Silva v. United States*, 980 F.2d 1482 (D.C.Cir.1993)); *see also All-state v. Hugh Cole*, 137 F.Supp.2d 1283, 1291 (M.D.Ala.2001) (stating that the fact that other causes go uneliminated goes to the weight, not the admissibility, of the expert testimony). Furthermore, even if direct evidence is lacking, an expert "may rely upon circumstantial evidence to support his theory" when other sufficient factors are present. *Allstate*, 137 F.Supp.2d at 1289 (citing *Rudd v. Gen. Motors Corp.*, 127 F. Supp 2d 1330 (M.D.Ala.2001)).

(2) **Under the Relevant Standards, McGinley's Testimony is Admissible**

(a) **Reliability**

■ Based on the criteria set forth in *Daubert* and Federal Rules of Evidence 702, the testimony of McGinely as to the origin and cause of the fire qualifies as reliable testimony. McGinely's testimony was based on his investigation of the cause of the fire, an investigation which was conducted in accordance with the professional standards and scientific methodology used by experts in fire and explosion investigations, and set forth in the National Fire Protection Association, Inc.'s "Guide for Fire and Explosion Investigations" ("NFPA 921"). Technical Committee on Fire Investigations, National Fire Protection Association, Inc. 921: Guide for Fire and Explosion Investigations (1998); *see also Travelers*, 150 F.Supp.2d at 366 (recognizing that the NFPA 921 is "a peer reviewed and generally accepted standard in the fire investigation community").

The NFPA 921 sets forth professional standards for fire and explosion investigations and provides a six step process in which an investigator must: (1) recognize that a need exists to determine what caused the fire; (2) define the problem; (3) collect data; (4) analyze the data; (5) develop a hypothesis based on the data; and (6) test the hypothesis. Technical Committee on Fire Investigations, National Fire Protection Association, Inc. 921: Guide for Fire and Explosion Investigations, 9–10 (1998).

A comparison of McGinley's methodology and the six steps of the NFPA 921 methodology reveals that his conclusions were based on these recognized standards and not merely his subjective belief. *See Daubert*, 509 U.S. at 589–90, 113 S.Ct. 2786 ("The subject of an expert's testimony must be 'scientific' . . . knowledge. The adjective 'scientific' implies a grounding in the methods and procedures of science. Similarly, the word 'knowledge' connotes more than subjective belief or unsupported speculation."). Therefore, McGinley's tes-

timony satisfies the standard of reliability under *Daubert* and Fed. R. Evid. 702.

In following the NFPA 921 methodology, McGinely recognized that, in order to determine whether plaintiff had a viable cause of action against defendant, it was necessary to determine the cause of the fire. He then defined the problem and collected data, which included: (i) obtaining color copies of the photographs taken by the Magee family; (ii) obtaining the reports from Earl Sheldon (investigator, Investigative Resources Global, Inc.) and Jerome Levine (consulting engineer, Jerome G. Levine, Inc.); (iii) taking the depositions of Patrick Magee, Sr., Patrick Magee, Jr., Linda Magee, Earl Sheldon, Sean Tichenor (JDC employee) and Detective Barry Sherry (Rockland County Police Department); and (iv) personally interviewing Patrick Magee, Sr., Earl Sheldon, Paul Kaczmarczik (electrical engineer) and Jerome Levine. McGinely then analyzed the data and developed his hypothesis that the fire in the Magee's garage was caused by smoldering molten slag resulting from the carelessness of JDC's employees. Finally, in developing his hypothesis, McGinley relied on deductive reasoning, a method recognized as "scientific", and identified all of the potential ignition scenarios. Technical Committee on Fire Investigations, National Fire Protection Association, Inc. 921: Guide for Fire and Explosion Investigations, 9 (1998). He eliminated the heating system as a cause of the fire through his discussions with Levine and Sheldon. He eliminated the electrical system as the cause of the fire through his discussion with Kac-

zmarczik. Commonplace causes, such as careless disposal of cigarettes, and incendiary causes, such as arson and lightning, were eliminated based on a reasonable analysis of the circumstances. After examining all of the evidence, McGinely concluded that molten slag was "most probably" (although not conclusively) the cause of the fire on plaintiff's property.

The NFPA 921 states that "generally, if the origin of a fire cannot be determined, the cause cannot be determined." Technical Committee on Fire Investigations, National Fire Protection Association, Inc. 921: Guide for Fire and Explosion Investigations, 72 (1998). Defendant contends that, under these governing standards, McGinley could not determine the cause of the fire with any reasonable degree of certainty because he failed to identify the point of origin of the fire. However, a careful reading of the NFPA 921 shows that it does not require that the exact point of origin be determined and McGinley does provide a reasoned explanation of his identification of the area of origin of the fire.[3] According to his theory, the molten slag was projected from one of many areas of the garage where JDC employees were cutting beams. The molten slag then became embedded in a floorboard and smoldered there until eventually igniting and starting the fire. Consequently, McGinely hypothesizes that it is impossible for anyone to determine the exact point of origin because the floorboard where the fire originated has been destroyed. Based on this logical analysis coupled with McGinely's extensive profes-

---

**3.** The NFPA 921 differentiates between the "area of origin" and the "point of origin": "The area of origin is almost always determined by examining the fire scene, starting with the areas of least damage and moving toward the areas of greatest damage ... Once the area of origin has been determined, based on the patterns produced by the movement of

heat, flame, and smoke, then the specific location of the origin can be identified. The specific origin will be where the heat ignited the first fuel and is commonly referred to as the point of origin." Technical Committee on Fire Investigations, National Fire Protection Association, Inc. 921: Guide for Fire and Explosion Investigations, 73 (1998).

sional experience as a fire investigator, McGinley's conclusion passes the threshold of admissibility mandated under *Daubert* and the Fed.R.Evid.[4] However, defendant may challenge the degree of credibility a trier of fact ought to accord McGinley's conclusion and present counter-evidence to refute the scientific veracity of McGinley's hypothesis.[5]

### (b) Relevance

Pursuant to Fed.R.Evid. 401, testimony is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R.Evid. 401. Based on that standard, McGinley's testimony is relevant, and thus satisfies the second-prong of the *Daubert* standard, because there is a direct relationship between the proffered theory, which provides weight to the plaintiff's assertion that molten slag resulting from the carelessness of the defendant caused the fire, and the cause of action.

### B. Summary Judgment Motion

Under Fed.R.Civ.P. 56(c), a court will grant summary judgment only if the evidence offered establishes that there is no genuine issue as to any material fact, and that the movants are entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). On a motion for summary judgment, the court views the record in the light most favorable to the non-movants, and resolves all ambiguities and draws all reasonable inferences against the movants. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8

L.Ed.2d 176 (1962); *First Fin. Ins. Co. v. Allstate Interior Demolition Corp.*, 193 F.3d 109, 118 (2d Cir.1999). However, where a plaintiff fails to establish an essential element of his claim, the court may grant a summary judgment since, as a matter of law, a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial. *Celotex*, 477 U.S. at 322–33, 106 S.Ct. 2548.

Viewing the evidence in the light most favorable to the plaintiff and resolving all ambiguities and drawing all reasonable inferences against the defendant, the defendant is not entitled to summary judgment. Defendant claims that, absent McGinely's testimony, plaintiff has no evidence that the carelessness of JDC employees caused the fire at the Magee's garage and, consequently, the complaint must be dismissed as a matter of law. However, since the requirements under *Daubert* and the Fed. R.Evid. have been met, McGinley's opinion is admissible and does create a genuine issue of material fact as to whether molten slag resulting from work performed by defendant caused the fire. Therefore, the motion for summary judgment must be denied.

### IV. Conclusion

For the reasons stated above, the court finds that McGinley's testimony is the product of reliable principles and that he has applied these principles and methods to the facts of the case in a reliable manner. McGinley's testimony is also relevant because it directly explains the cause of the fire. Therefore, the court finds that McGinely's testimony has sufficient relia-

---

**4.** Thus, McGinley's conclusion does have a "sufficient factual foundation". *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir.1996) (finding testimony was not "accompanied by a sufficient factual foundation" and therefore district court abused discretion in

admitting it) (citing *Gumbs v. Int'l Harvester, Inc.*, 718 F.2d 88, 98 (3d Cir.1983)).

**5.** For example, defendant could conduct his own tests to show that molten slag could not smolder for fourteen hours.

bility and relevancy to satisfy the admissibility requirements of *Daubert* and Fed.R.Evid. 702. Accordingly, it is hereby ORDERED that Defendants' Motion to Preclude Pursuant to Fed.R.Evid. 104(a) and 702 and for Summary Judgment Pursuant to Fed.R.Civ.P. 56 is DENIED.